Good morning. May it please the Court. My name is Tracy Kirkham, and I am the surviving founding partner of the appellant, Cooper and Kirkham. In 2015, my firm participated in a joint fee petition with all other plaintiffs' counsel in this litigation, in which it requested compensation for 5,108 hours of attorney time directed principally to developing evidence against the Phillips Defendant Group. These attorney hours were evaluated by a special master and confirmed by the District Court as having been high-level work that contributed to the Phillips Group making the second-largest contribution to the settlement fund. We were awarded a fee in 2017 of $3,452,040. In 2022, the same District Court denied compensation for 2,554 of those attorney hours by cutting in half our 2017 fee award after adjusting for the 2020 amended settlements. That is about two years of an attorney working full-time for no compensation. This calamity befell us because the District Court made a blatant error of fact and a fundamental error of law. First, it found, without any evidence that is lead counsel for the non-repealer state subclasses, I took unspecified actions that caused a delay, quote, for a period of years, close quote, in the payment of claims submitted by settling members of repealer state subclasses. There is a sort of surface logic to the idea that if a settlement approval order is appealed, it must delay something, and that must ultimately delay payment to claimants. In fact, 20 years or so ago, my firm made that argument to this Court in an attempt to secure an appeal bond. We were looking for a way to dampen the enthusiasm of a then-growing specialty bar, the professional objectors, lawyers who never met a settlement they couldn't appeal. The problem was we couldn't prove delay, and this Court rightly rejected our bond request. Well, but the situation is a little different, because we're dealing with a factual finding by the District Court. It seems to me it's your obligation to establish that's clearly erroneous, and frankly, since the judges in this case have been living with this case, I have a hard time believing there's evidence that there wasn't delay. There's no evidence in the record. You're asking the wrong question, because your obligation now is to establish what the District Court concluded was clearly erroneous, not that he didn't properly prove it. And so how can it be said there hasn't been delay because of the appeals of the settlement approval? Because of the duration of claims processing in these cases. Well, you're asserting that, but I don't see proof of that, and if the obligation is on your side in this case to establish it's clearly erroneous, I'm not sure it is telling us that, well, it would have been delayed anyway, is going to be enough. No, the own, no, what, no, claims processing isn't a delay. Claims processing is the time that it takes to review, to audit, to collect information, to track down the people who have moved, to find the people who write to you and tell you my dad died and the claim was in his name, and will you please now send the money to my mother, and all of that, that's not delay. That's part of doing this job. But the delay, the delay that is argued. And the settlement administrator set out in the only evidence we have about the duration of claims processing, how long it took him to process the claims in this case. And there are two things that caused that process to be somewhat elongated from what it might have been otherwise. One is the fact that the counsel made the decision, and I'm not criticizing him for the decision, to tell the people who had filed claims in connection with the 2015 settlement, remember that one that came up to this court and then the district court decided that it was wrong to have approved that settlement, the people who submitted claims in connection with the 2015 settlement did not have to resubmit claims in connection with the 2019 amended settlements. However, when those settlements were approved in the middle of 2020, the district court opened, reopened the claims period. And there had also been a lot of late filed claims that came in from people who weren't aware of the appeal of the 2015 settlement, so they were coming in over the years. And if you read the declaration of the settlement administrator, which is in this record, it's 2ER79-82, I'm sorry, that's actually a citation of the district court. If you look at the settlement administrator's declaration, which is really the only evidence in the record about claims administration, he details everything he did for all of the 2015 and May of 2022. And interestingly enough, more than half of the money he was paid was paid to him between 2020 and 2022. I've got a slightly different cut on this case, or a different way of looking at it. You earned fees, $3 million and change, based on your earlier work. That's correct. You were then really given a different client. Then, working for the different client. Not the different client. It was in the same class that I was working for. It was a subclass. It was a subclass. But you can't, that's not an adversarial situation. That is a part of the same group that I was working for, just to make that clear. Well, what I see the district court as doing, in effect, was now that you're representing, I'll say a different client, you can say a subset that's different from the earlier set, punishing you for working for that client and deducting the fee that you earlier earned. But you don't quite make the argument that way. Well, it didn't deduct the fee. It didn't deduct like work I did for the subclass. I know that, but no, you don't understand my argument, my point. Maybe you do, maybe you don't. I think I actually do make the argument in the part of my briefing that talks about what subclasses are and what subclass representation is. When a district court is looking at a settlement for approval, whether it's a settlement for part of a class or a global settlement for all of a class, it looks at that settlement with a fiduciary duty to the entire class. That duty never goes away. And so part of the district court's satisfying its fiduciary duty in this case was actually appointing me to be subclass counsel for class members who were not participating in the settlement. It didn't make me an enemy. How did you come to be that counsel? I volunteered for it, which has happened in—I mean, my firm has been lead counsel in decades of cases and had leadership roles. And I can't tell you how many cases there are issues that come up for subclasses. And counsel who have been counsel for the class frequently volunteer to be counsel for the subclasses. In fact, in my briefs, I cited a Ninth Circuit case where I think it was the defendants argued that if you were counsel for the class, you had a conflict in becoming counsel for the subclass. And this court said, rejected that and said, no, you don't have a conflict. Judge Gaskin. Excuse me. Counsel, did C&K have any residual duty to protect the interests of the nationwide class as a whole following its appointment as subclass counsel? Yes, I believe that not only did I have that duty, I believe that lead counsel, Mr. Aliotto, had a duty to my subclass members as I had a duty to his subclass members as part of our duty to the class as a whole, which kind of got lost in this entire thing. I think the district court looked at the subclasses like we were traditional adversaries, plaintiffs and defendants in front of it, instead of what was sort of like a family dispute. Subclass disputes are settled within the context of the bounds of the unified class. The objective is not to let the subclass disputes blow the class apart and turn this subclass, the settling subclass, into the adversary of the non-settling subclass, and so we get to fight it out with nuclear weapons. The idea is to resolve those disputes, and I certainly believe that I did everything I could to resolve the dispute. What do you make of the argument dealing with the district court's approval of the allocation, that the expected value of the claims that C&K, for example, sought to preserve by objecting to the settlement was about $0, whereas the considerable loss value, time value of money that would have been awarded to settling class members was in the millions of dollars? First of all, that was not a finding. In fact, it was an off-the-cuff remark. Second of all, once I was appointed by the district court to protect the interests of the NRS subclasses, I was appointed to protect their interests, their claims, good, bad, and ugly. I had a fiduciary obligation to advance those claims to the best of my ability, not to evaluate them and say, oops, I'm not going to push that because the fact that the settlement is going to erase the ability for this class to pursue its claims as a class action, well, I'm deciding their claims aren't good anyway. The fact that the court recognized that it had a fiduciary duty to that subclass, recognized it as a subclass, recognized that it had a duty to appoint counsel for that subclass, meant that its off-the-cuff remark about whether its claims were good or bad was sort of obliterated by the fact that it appointed counsel to advance those claims, and that became my duty. You say it's an off-the-cuff response, but if you could help me understand this, and believe me, there's a lot of history in this case. You know, page three of the district court's opinion, which we are reviewing, and which my colleagues have referenced, the judge said, because of the delay, some class members will not receive any benefits from the settlements because they have died, will not be able to be found, or are companies that have gone bankrupt or no longer exist, and the class members who did receive benefits will be receiving them years later than they would have without subclass counsel's efforts. Is that what you consider to be off-the-cuff? No, no, no. The reference you made to the zero was in an older, a prior hearing before the district court appointed subclass counsel for the NRS subclasses. That's what I was referring to as off-the-cuff. The pothole statement, the premise of that is that there was a delay that I caused, and there is no evidence in the record. There's no evidence in the record that the class members could have been responsible  Sotomayor, when a judge asks you a question, you should stop and listen to the question and not try to talk over the judge, because we're not going to be listening to what you're saying when we're trying to ask a question. I apologize. And we go right back to the question I posed earlier, which is what evidence do you offer from the record that establishes what the district court said was clearly erroneous? You've made a general reference to Administrator's declaration. Perhaps before the end of the day you can tell us where we could find that, but I'm still not sure what it is you're pointing to if you insist that, well, they've got a burden to show something from the record. I don't think that's how it is here. And I guess I should also ask, do you plan to reserve any time for rebuttal? I did. I'm down to two minutes. Could I answer your question and reserve two minutes for rebuttal?  Thank you. The district court's finding of delay needs to be grounded in some evidence in the record that the class members could have been paid, as the district court put it, years earlier than they were paid. There is no evidence of that in the record. There is no evidence that claims processing was concluded before May of 2022, and there is no evidence that I played any part in the duration of claims processing. The settlement administrator's declaration, and I will get you the site in a moment, the settlement administrator's declaration covers what he did from 2015 to May of 2022 to process claims. There were old claims. The claims period was reopened. I think we have your point. We'll still give you two minutes for rebuttal. Thank you. And we will hear from Mr. Aliotto. Good morning, Your Honors. Mario Aliotto. I'm the lead counsel for the indirect purchaser plaintiff class in this case, a case which was filed in November of 2007. We're coming up on our 17-year anniversary in November. We should have been done years ago. The last duty I had in wrapping up this case was to allocate the fee we were awarded, allocate that fee among 50 firms. I thought the underlying case was tough. That allocation process was difficult, but we got it done. And 49 firms were paid. The matter was completely resolved. Among those 49 firms were two other firms that had 50% cuts because they had activities very similar to the Cooper & Kirkham firm. Those matters, they accepted those fees in those cases. So we just have this one final allocation to the Cooper firm, and that is the last thing that's standing in our way to getting this resolved. This is really quite clear, and we have to, as Your Honor alluded to, there's this interplay between delay and claims processing. This is absolutely fundamental. You cannot pay claims until you have a final judgment. The final judgment in this case was delayed for years. We've detailed in the brief all of these various activities I don't want to get into. We've kind of lived it, so we understand how long this has been around, and that's just the appellate stage. But let me focus on the particular challenge, which is that the payments wouldn't have been made anyway because the claims processing would have taken as long, and so there was no actual delay. Let me, I want to make this clear. I went back and reviewed the briefs and discussed with my colleague this argument. And the fundamental problem is this, Your Honor. This evidence that the appellant has been referring to is a declaration of the claims administrator. This is your, they refer in the brief to a report. Well, the claims administrator doesn't make a report. We file a motion to pay claims, and the claims administrator supports that with a declaration setting forth everything the court needs to know so that the court can order the payment of the claims. But here is the very important thing about what we're dealing with here. And I don't want to get into this. I'm sure you hear this all the time. Something wasn't raised in the trial court, and this wasn't raised, that wasn't raised. I don't want to get into that because it's wasting valuable time. But this case does have four issues on appeal. Three of them were not raised in the district court, including this issue. And let me get a little more specific with this claims processing issue. The motion in the trial court to allocate the fees, which is the order arising from that, is the order we're here on today under review. That matter was under submission in April of 2022. The motion to allocate the fee was done. It was closed. All of these arguments that are being made here today were not made on that motion. After that motion, two or three months later, there was another motion. After we got the fees taken care of, we went into the court and we said, Your Honor, we're ready to go. We have finality. We have the attorney's fees resolved. Now we want to pay the money, and we want your permission to do it. In conjunction with that motion, two months later, two or three months later, the claims administrator filed a declaration. It's actually an amended declaration. Do you happen to know where it is? 2ER2. 2ER2. And that is what the appellant has been referring to. This is a filing two months after the fee allocation motion was submitted. Now, and this obviously was not part of those proceedings because it came after. Now, all of a sudden on this appeal, this declaration in an unrelated proceeding is the centerpiece of this argument on appeal. Okay, so what? Well, so what? There's no record. Let me ask a different question, and I asked a version of it from your adversary earlier. Let's assume that the Gruper and Kirkham firm had done the work, the hours that we're talking about, and had never been assigned the additional work with this subclass with, in a sense, a new kind of new client. Would they be entitled to the fee that they'd earlier earned if they'd never done the work that caused the delay? I'm assuming the delay was caused. I'm not sure I understand the question. Okay, your argument is, and the district court seemed to have said, I'm cutting the fee in half because of the delay that they've caused, that they should not have caused. Assume that the Gruper and Kirkham firm was never assigned this new task and they'd never caused any delay. Would they be entitled to the entire fee of $3 million and change? No, Your Honor, because there were other problems. I mean, this is one component of the judge's ruling. In the record and in our briefs, we've detailed not only did they cause delay, when they came in and inserted themselves into the litigation, one of the first things that Gruper and Kirkham did, along with some of these other objectors, was come into the court and ask them to vacate the judgment. I don't know what could be more. It sounds like that's more delay. And it's also delay. If they had taken no action, they would have had their fee. They would have been subject to the formula. There would have been no reduction. But their circumstances are completely different. Okay, so the answer to my question is yes. If they hadn't done any of this later, they would be entitled to the fee. Well, it sounds as though they were working for a different, I'll call it different client, but a different subclass, and they're being punished for the work that they did, not saying that you didn't do the work earlier and it wasn't worth anything. So that's a really odd way to calculate attorney's fees. Well, let me say this about subclass. Let me say this about subclass. This is a law firm that inserted themselves into the litigation. There's no subclass here. There is no subclass. Are you answering my question? I'm trying to, and I'm trying to give some background on this, and I'm aware of these duties to subclasses. But in this case, there is no subclass. There is no Judge Tiger didn't say, I want to reach out to somebody and represent subclasses. There's no complaint. Let me reformulate the question. I think it can be more readily understood. The firm did a lot of work for which they were awarded, or at least on paper awarded $3 million in change. The firm then got a new assignment. And in the prosecution of that assignment, I'll take your version of the fact that they caused a lot of delay. And it looks to me as though Judge Tiger is punishing them for causing the delay by deducting from their fees the fees that they'd earned earlier, not that they hadn't earned them before, but it's basically that they misbehaved later. How is that a mistake as to what actually happened? Am I describing things incorrectly? Here's where I differ with your honors. With all due respect, Your Honor, there was no assignment from Judge Tiger. This law firm inserted themselves into the case. Then we still are not talking about the same thing. As I read Judge Tiger for the purpose of my question, he is not saying you didn't earn the fees earlier, but he's punishing the firm for behavior that they did later. No, Your Honor. There's no element of punishment here. What Judge Tiger did— But I assume Judge Tiger deducts from the fee based on the behavior that was later. Correct? Judge Tiger assessed the fee. There was no—he didn't come out and say, I'm going to take these hours away or I'm going to reduce your hourly rate. What Judge Tiger did under that—I believe it's FPI-Agritech. That's the leading case on fee allocation, what the judge should do. The judge has broad discretion under that case, Ninth Circuit case. What the judge did is weigh the contributions of Cooper and Kirkham vis-a-vis the contributions of all of the other lawyers. All of the other lawyers, or at least a large portion of them, continued to work on the case and support the case and seek the settlement approval. They were up here when we came the last time we were here. We were here to get the amended settlements approved, which were approved. There were a number of lawyers in the case that were working on this case all the way up years and years after the conclusion of the settlements. The Cooper firm was working at odds to the case. They were impeding the resolution of the case. They were putting the case at risk. Under the Agritech case, the judge has broad discretion. He's been living with this case for not the whole 17 years because Judge Conte was the judge initially, but he came in after Judge Conte and he knows firsthand what went on in this case. This is not a case, with all due respect to my brethren at the bar, this is a case of extreme mischief. This is a case of lawyers inserting themselves into a settlement, a very, very successful settlement, inserting themselves into a case that had been settled, trying to reopen it, and all of this is predicated upon non-viable claims. Now, let me just put it. Was it seven years ago or something we started talking about this? At that point, you were lead counsel for a class that included more than the group of people that were going to receive a payment under the settlement, and that actually was the nub of the problem at that point. And so it probably was pretty clear from, indeed it was clear, because we were asked to hold off and send the mediation and so forth. The resolution that ultimately came out of the process when it went back to the district court, and we've approved the settlement, so I'm not saying that's at issue, was to break the class into pieces. Well, at the start, as lead counsel, you had obligations to everybody, and all the other counsel had obligations to everybody, and at some point the district court decided that had to be broken up. Now, I understand that you've said and Ms. Kirkham has acknowledged that they weren't pulled out, they weren't drafted for the assignment. They volunteered for and were given the assignment of representing the NRS subclass, and somebody else had the ORS, I guess. And what happened to your responsibilities at that point as lead class counsel to the people that fell within the NRS subclass? We made the decision initially, and we held to this view all along, that this nationwide injunctive relief class was not viable, Your Honor. So let me put a little flesh on the bones here. At one time, back in 2007, there was a claim for injunctive relief in the case, and that meant that we wanted to recover damages, of course, for the overcharges, and we also sought or alleged a requested relief in joining the defendants from further price fixing. It's quite common in these cases. You seek damages, you seek an injunction against further price fixing. Fifteen, sixteen, seventeen years down the road, that didn't make sense anymore. Number one, the product has gone the way of the buffalo. I still have a cathode ray tube, more than 20 years old now, television in my chambers, but, yes, the time has marched on, and so, okay, the injunction wouldn't matter. The claim was no longer viable because the product was no longer in existence. It had gone the way of the dinosaurs. So it didn't make much sense to enjoin these defendants from fixing prices on a product that no longer existed. Could I ask a quick question? Yes, Your Honor. It's sort of a broader policy question, returning to the questions by my colleagues. What is your response to C&K's argument that holding in your favor would discourage counsel from representing subclasses in the future? That, you know, here are plaintiffs' counsel who have invested thousands of attorney hours in litigating against the defendants, as C&K did here, will not jeopardize their compensation by undertaking representation of a late identified subclass? No deterrent whatsoever. No deterrent whatsoever, Your Honor, because if they want to represent those subclasses, they can do it early on. They can do it when it became apparent, in this case, in 2012, it was apparent that we weren't pursuing these claims. They didn't jump on the bandwagon then. They could have, and then the cases would have proceeded together. They came in and asserted themselves after settlements, after the money was in the bank, after fees were being considered by the court. So this is a very novel situation. But who divided it up into the subclass? I thought it was the district court. I don't think they divided it up into the subclass. There are no subclasses, Your Honor. There is no complaint by this group. If there's no complaint, there can't be any subclasses. Well, we've been talking about subclasses. Are you now changing our working definition of subclass? Subclass is not our term. Subclass is their term. What it really is is a hopeful subclass that someday is going to arise. Well, but the district court seemed to think there was such a group and assigned them to represent that group. The district court was confronted with people saying there are viable claims. We want to represent these claims. Mr. Alioto did a tremendous disservice, and he didn't pursue these claims, which we didn't pursue them because they were not viable, and they're not viable to this day, which let me just put a footnote on that comment. These claims that their argument is based on, these underlying claims, what happened to them? What happened to them? They haven't pursued them. They wanted to inject themselves in litigation at the fee stage, at the settlement and the fee stage, inject themselves in the litigation and jump on the bandwagon. They didn't want to pursue these claims independently, and if they wanted to pursue them independent of this major litigation that we were handling, why haven't they pursued those claims? And as we mentioned in our brief, once they couldn't jump on our bandwagon, they didn't pursue the claims independently. Well, in renegotiating the agreement with defendants, defendants managed to save, what is it, $29 million by not obtaining releases from these parties who you tell us did not have viable claims, and you agreed to that discount and wound up indeed taking it out of the attorney's fees allocation, and so how can we take as a given that these claims were valueless because you wound up giving up $29 million in exchange for not giving defendants releases? That's a very good question, Your Honor. We gave up $29 million for claims that were worthless, and why did we do it? Because we were caught in a conflict with our clients, our class members, and I had the choice of not doing that and litigating and showing that those claims were valueless or the choice of keeping those class members hold and taking it out of the attorney's fees. That's why we did that. We didn't do it because they were valuable. We did it because it was our duty to the class, and the way we characterized that, I think Your Honor said we paid them or we gave up the releases or gave them money for the releases. What we really did there was give a $29 million windfall to the defendants because of the action of these objecting counsel, and no one to this day has pursued those claims. Absolutely tragic. The years and years of litigation here all premised on this premise. We want to represent these people. They have valuable claims. We're going to get them money. What happened to that? Nothing, nothing. It was a fake. It was a pretext. This is about an attempt to jump on the bandwagon of a very, very successful litigation handled by a number of firms. I'm not up here blowing my own horn. There were a lot of firms involved, and they did a wonderful, wonderful job. And at the end, the efforts got sabotaged. That's what this is about. And Judge Tiger, in his broad discretion under the Agritech case, he didn't cut fees or chop fees down. He assessed their fees, Cooper and Kirkham's fees, vis-a-vis the work that other people in the case did, other firms in the case did. Given the order says 50% reduction, it's hard for me to see how he didn't chop fees down. I mean, he didn't try to do any of it. He didn't explain any other approach, any other reason to calculate to the number that he ultimately is prepared to award them. So we can talk about whether it's punitive, but certainly the method of calculation seemed to be we're going to cut them in half. Agreed, Your Honor? Agreed? Cut them in half based upon what he saw as bad behavior. Yes, and if anyone was in a position to assess that, it was him. But that doesn't mean they didn't do the work that entitled them to the fees in the first place because it suggests to me that absent the bad behavior, they would have been awarded the $3 million in change. Absent what he considered to be the bad behavior, they would have got the full amount. Yes, and if you compensated them along those lines, that would be unfair to the people that continued to work in the case. What about the firms, the half a dozen firms who are continuing to work on the case and they would be compensated in the same fashion as Cooper and Kirkham who are attempting to stall the case, undermine the case, and vacate the settlements? It just, in Judge Tiger's broad discretion, that's what Agritech said. Maybe you're going to disagree with my characterization here. You're saying that it is properly within Judge Tiger's broad discretion to cut a fee that otherwise would have been proper in half based upon later bad behavior. Absolutely, Your Honor, absolutely. And furthermore, not only is it within his broad discretion, but we cited the Fox case in the United States Supreme Court. These fee decisions in the district court are entitled to great deference. They're entitled to deference under that case. Is there a notice issue here, though? In other words, should the district court have warned C&K, whether at the time of appointment as subclass counsel or at some later stage, that representing the subclass might result in a reduced attorney fee award? Well, that's an interesting question. At the time they came in and inserted themselves into the case, the judge noted that these claims that you are bringing, he was talking now about damage claims, he noted, as other, I think even this court has noted that in prior hearings, he noted that I don't see where those cases are going. The claims don't seem to be valuable to me. Well, they were valuable enough so that you agreed to a discount in the attorney's fees that benefited the defendant. I think, frankly, what I anticipated when everybody left the room the first time, let's go back to the more mediation, was that something was going to be done to give something to the parties, the class members who were expected to give up a release. Instead, what happened is that they were left out and defendants got the benefit. Now, I don't want to know how it got to that result, but it becomes hard to say that C and K was talking to sabotage the class as a whole, although they did oppose the settlement. It's pretty plain what they were trying to do was get the piece of the action that wound up going to defendants instead. So it just does seem like Judge Tiger decided, well, these are the fall guys. Am I wrong in my perception? Well, they are not fall guys, and they are not alone. There were two other firms that were treated exactly the same way, Your Honor. But they've dropped out now. Yes. Well, neither one of them appealed. One accepted the money. The other one also accepted it and appealed on some other grounds. It had nothing to do with this. And that appeal was summarily affirmed. So that was gone. But the important point I want to make, I'm going to think ahead here because I'm not going to get any time to reply. Coming back to this point about Cooper and Kirkham have never pursued these claims. They tried to pursue them as part of this litigation in the district court, and Judge Tiger said, no, you can't come into this case. You have to file a separate action and then go to the panel on multidistrict litigation and bring that separate action. You keep saying that they inserted themselves into the litigation, and I assume what you're talking about is representing this subclass later on. But obviously they'd have been in the litigation before because they'd earned $3 million and change. So what do you mean by inserting themselves into this litigation? Inserting themselves in to represent new clients. They had a client. You're right, Your Honor. They had a client in the underlying case. So you're not saying that they didn't earn the initial $3 million. You're just saying that the deduction based on their later behavior is appropriate. Yes. Yes. And when they did this, they abandoned or they withdrew from representing their original client, and then they took on new clients with new claims. And again, they have to be treated differently. Look, we have no ax to grind here. We're trying to allocate a fee. We're trying to get 50 firms happy. And in consultation with some of these firms, I didn't just make this decision out of thin air. We kicked it around. We talked about it. We said what's fair here. What's fair is we're going to do a formula, and there are three firms that caused additional problem at the settlement phase, and they're going to be treated differently. And we thought that was fair. And what happens to the money that otherwise would have gone to them? That money, hopefully once this case is affirmed, that money has been held back and will be distributed back to all of the firms that kicked in. We had all of the firms kick in a pro rata amount to hold in reserve so that if there was a reversal, we'd have the fund to pay that. If there's an affirmance, that money is going to go back to the other firms. There's some discussion in the brief that we're going to take that money or we have a vested interest in that money. No, we don't have any vested interest in this. This is one out of 50 firms that we're trying to get resolved. And if there is an affirmance, the money that we've held back is going to go to all of these other firms that have continued to work on this case. We've kind of blown the time schedule. Do you have anything to say to wind it up? I apologize. I'm not going to get a chance to reply. Not your fault. We've taken you there, but. Thank you. I'm not going to get a chance, but I said they haven't pursued the claims. I suspect we're going to hear the appellant say, it's not worth it. Under the law, we can't pursue these claims because we can't pursue a class action under the law, and therefore it's not worth it. Well, what about the individual claim? They represent a client. They have a client. The client can bring a claim for injunctive relief. The client can bring a claim for a damage claim. He can bring whatever he wants. And under the law, under the Sherman Act, you're entitled to your attorney's fees. So I have no. I think we have your point. Yeah. Thank you, Your Honor. Very good. Any further questions? Thank you. Apologize to Ms. Capurro, but we don't have any time left. It's okay. I will point out that my opponent did get 100% more time. We're well aware. I suspect when it hits zero, you're not going to stop talking. Not if you're still talking to me. On the bad behavior point, there is no finding in this record at any point in time by the district court, nor did any party ever ask the district court to find, that anything that I was doing, any action I took, any objection I filed, any request for stay that I filed, any motion that I filed, any appeal that I filed, was frivolous or improper or outside the bounds of my fiduciary duty to the NRS subclass. Now, this whole business about there being no subclass. Your duty to the NRS subclass, you're not seeking fees for what you did on behalf of the NRS subclass. No, but they're saying my prior fee can appropriately be cut in half because I behaved badly representing the NRS subclass. Well, you did oppose the settlement agreement. It may have been something you had to do, you thought, for the NRS subclass, but it's hard to say how it served the interest of the class that ultimately was trying to collect money. Well, actually, oddly enough, at law it did because to pass constitutional muster, the decision to approve that settlement had to be made pursuant to the district court's fiduciary duty to all class members. Remember, there was a certified nationwide class at that point in time. And all of those class, the district court owed a fiduciary duty to all of those class members. So when it was looking at the settlement of some of the class members, that did not obviate its duty to the rest of the class. And to satisfy that duty, it actually recognized the interests of the NRS subclass and it appointed counsel. That seems to put the burden. Will you stop talking when a judge is trying to ask you a question? That seems to tiptoe away from the notion that you volunteered for that assignment. It's not like the judge said, well, somebody in this room is going to have to take on this. I'm going to appoint you. You moved and, indeed, gave up the client that you had in the class that was going to get money in order to represent this subclass, presumably thinking you could do even better on behalf of what the NRS subclass was doing. It didn't turn out that way. And you keep telling me about the judge has a fiduciary duty. I mean, the settlement that he approved was ultimately affirmed. It's not at issue anymore. So I have a hard time perceiving from what you're saying that Judge Tiger somehow would have violated a fiduciary duty if he didn't have somebody actively trying to get something for the NRS group that included trying to hold the settlement hostage. And so this doesn't really seem to add up to me that this is something you were forced to do with a gun to your head by Judge Tiger, so where am I wrong? I was actually not trying to hold the settlement hostage. Then why did you object to it? I objected to it for two reasons. One was that because of the district court's decision that for the first time in history that the multidistrict litigation statute divests transferee courts from the ability to have people intervene, class members intervene and become plaintiffs in cases that have been consolidated in an MDL because that issue was up on appeal. And this settlement was going to do what it did do. It was going to dismiss. If I didn't have a plaintiff who could intervene, it was going to dismiss all of the claims brought on behalf of the NRS subclass. It was going to stop N-class action tolling, and it was going to mean that the subclass as a subclass could no longer aggregate its claims in a class action. And so I was trying to prevent that from happening before this court could review the district court's decision on intervention, which I believe with every fibre of my being was an error. As it turned out, that didn't happen. The appeal was mooted. The subclass was divested of its ability to bring a class action. No class member in the NRS subclass can file a class action under class action tolling. That is a real damage that I had a duty to try to prevent. That damage has been recognized in the death knell doctrine ever since Eisen v. Carlisle and Jacqueline, when the Second Circuit said the denial of class certification is an appealable interlocutory because the denial of certification can be the death knell of the substantive causes of action being aggregated there. So I had that duty. Yes, I also objected that not being sent for a global settlement when we came back down from the Ninth Circuit after the 2015 settlements were appealed, that not being sent out to mediate a global settlement, I objected was not in the interests of all of the members of the nationwide class, that subclass by subclass settlements are not in the best interest of classes. I also believe that with every ounce of being. So I was doing something not to get more fees necessarily. Also, I might add that my client, who was a Californian, who therefore was in the damaged subclasses, when the 2015 settlements came along and even when we came back down, waived any conflict for me to represent the NRS subclasses. The judge said, no, you can't represent that client, even if he waived the conflict. And so I had to withdraw as counsel for my California client. And there were co-counsels, so he was not damaged by my withdrawal. But this whole thing about bad behavior, there has been no adjudication of bad behavior. And, in fact, the district court didn't actually say I behaved badly. He just said I delayed the settlement. I plead guilty. I'm the one who introduced the term bad behavior. There's no finding of bad behavior by the district judge. I totally agree with you on that point. I'd also like to say one thing about the questions about the settlement administrator's declaration in the record. Here's the chronology. In March of 2022, the district, excuse me, in March of 2022, lead counsel made a motion to allocate the fees in which he asked the district court to cut my fee by 50%. I opposed that motion. There were reply papers. The briefing for that motion did, in fact, wrap up in August. There was never a hearing on the motion. In June of 2022, the settlement administrator put in a declaration. And I might add, actually, that lead counsel's declaration in support of the motion to cut my fee has a paragraph in it in which he says that he is, quote, working on finalizing claims. That is a present participle. That means as he was writing that, he was working on finalizing claims, i.e. claims were not finalized then, nor were they finalized years earlier when supposedly they could have been paid. But then the settlement administrator puts in a long declaration supporting that idea that claims were not finalized until May of 2022. That declaration is put in when the briefing is closed, but not before the order is entered. The order on fees is entered in September of 2022. So the district court had, as he was considering, it was considering whether there was a delay, had that evidentiary record in front of it, even though it didn't exist at the time of the original motion briefing. I don't know if you have any more questions. Otherwise, I'll sit down. Apparently not. We thank you. We thank all counsel for the assistance you've provided us in this recurring and complicated case. That concludes the argument, and we are adjourned.
judges: FLETCHER, CLIFTON, Katzmann